Argued October 31, decided December 10, 1912.

## BROWN *v.* O.-W. R. & N. CO.*

(128 Pac. 38.)

**Railroads—Injuries to Shipper—Evidence—Sufficiency.**

1. In a shipper's action for personal injuries sustained while loading cattle on cars, evidence held to present a question for

---

*As to the duty of a carrier of live stock as to condition of stock pen, see notes in 44 L. R. A. 289, and 10 L. R. A. (N. S.) 571 ; and for liability of carrier of live stock to owner's caretaker for condition of stock pens, see note in 10 L. R. A. (N. S.) 576.

As to effect of shipper's negligence in loading car, or as to condition of car, upon the carrier's common-law liability, see note in 19 L. R. A. (N. S.) 952.

As to what constitutes delivery of freight to carrier, see note in 32 L. R. A. (N. S.) 313.            REPORTER.

the jury whether defendant was negligent in failing to provide a running board on the fence around its loading pens for the use of shippers.

### Carriers—Carriage ·of Live Stock—Nature of Carriers' Duties.

2.  Carriers of live stock are common carriers.

### Railroads—Carriage of Live Stock—Loading and Unloading— Injuries to Shipper.

3.  It is the duty of carriers of live stock to provide suitable and necessary means and facilities for receiving and loading stock, and such duty is not waived or shifted to the shipper because he loads or unloads them himself.

### Railroads—Injuries to Shipper—Proximate Cause.

4.  Where a shipper in loading cattle on a car was compelled, because of the absence of a running board on the fence of the loading pen, to sit astride of the fence and place his leg and foot inside the pen, where the stock in their natural efforts to avoid being forced into the car crowded against his foot and injured it, the absence of the running board was the proximate cause of the injury.

### Negligence—"Proximate Cause."

5.  "Proximate cause" is probable cause. It does not mean the last act of cause or act nearest to the injury, but such act wanting in ordinary care as actually aided in producing the injury as a direct and existing cause. It need not be the sole cause, but must be a concurring cause, such as might reasonably have been contemplated as involving a result under the attending circumstances. 'It is such cause as would probably lead to injury, and which actually has led to it. It need not appear that the injuries complained of resulted instantly and immediately from the act, since the law regards one act as the proximate cause of another without regard to the lapse of time where no other cause intervenes between such act and the injuries, but there must be nothing to break the casual connection between the act and the injuries.

### Railroads—Shipper's Injuries—Contributory Negligence.

6.  Where a carrier of live stock failed to provide a running board on the fence around its loading pens for the use of shippers in loading stock, the shipper was not guilty of contributory negligence in sitting on the fence in order to force the stock into the car, since he either had to use such instrumentalities as the company furnished or fail to ship his stock.

**Railroads—Shipper's Action for Injuries—Evidence—"Negligence."**

7. Where it was claimed that a carrier was negligent in failing to provide a running board on the fence around its loading pens, evidence that other roads similarly situated provided such a running board, and that it was in common and general use, was competent, since "negligence" is the failure to do what an ordinarily prudent person would do under the circumstances, and such evidence tended to show that ordinarily prudent carriers would furnish such a running board.

**Railroads—Shipper's Action for Injuries—Evidence.**

8. Where it was claimed that a carrier of live stock was negligent in failing to provide a running board on the fence around its loading pen, and there was evidence that its yardmaster had charge of the pens and carried the key thereto and was the person who removed the running boards, evidence that plaintiff told the yardmaster that the absence of the running board was a source of danger, and asked him to replace it, was competent; the testimony tending to show that the yardmaster was a vice-principal, and that notice to him was notice to the company.

**Damages—Evidence—Loss of Earnings.**

9. In an action for personal injuries, evidence of plaintiff's earnings under an arrangement to act as agent still in force at the time of the accident was competent to show his earning capacity, although there was no binding or continuing contract, and no fixed salary.

**Damages—Evidence—Loss of Earnings.**

10. In an action for personal injuries involving loss of earnings, evidence fairly indicating plaintiff's capacity to earn money in his usual vocation and the probability of his being able to do so in the future should be admitted, but evidence consisting of mere guesswork and speculation upon what might happen in the future should be excluded.

**Carriers—Carriage of Live Stock—Receipt for Shipment.**

11. Live stock was accepted by a carrier for shipment when it gave permission to load it on its cars, whether or not it was so accepted when it allowed the stock to be placed in its stock pens.

**Appeal and Error—Review—Technical Errors.**

12. Where the parties have had a fair trial, and were given an opportunity to present the case on the merits, the judgment will not be reversed for trifling and technical errors which have not occasioned an unjust verdict.

From Baker:  WILLIAM SMITH, Judge.

Statement by MR. JUSTICE McBRIDE.

This is an action by P. J. Brown against the Oregon-Washington Railroad Company, a corporation, to recover for personal injuries sustained by him while loading his cattle upon defendant's cars at Baker, Oregon. The circumstances attending the injury were as follows: In April, 1911, appellant maintained a row of stock pens at Baker, fronting on a loading track running north and south, with a runway in the rear of the pens leading to two loading pens, situated at the extreme south end of this row of cattle pens. Each of these loading pens was equipped with a loading chute, built on an incline leading to a platform, which was built parallel with and between the loading track and the east end of the pens. Along the sides of these chutes and some three or four feet from the ground were built projecting platforms or walks for the men engaged in loading the cattle to stand upon when prodding the cattle through the chutes into the cars. On the 10th day of April, 1911, the respondent, who was an experienced cattle man and cattle shipper, mounted his horse, and with two or three helpers drove a bunch of steers out of one of the pens into the runway in the rear, and south in the runway until they reached the first loading pen, where they turned and confined the cattle into said loading pen, and then they dismounted from their horses, plaintiff leaving his horse in an adjoining pen, and two men went into the loading pen on foot with the steers. A man by the name of Green stationed himself on the outside of the north fence with a prod pole, and plaintiff with a prod pole in hand took

a position astride of the south fence about halfway between the rear of the pen and the entrance to the loading chute. The loading pen was some 56 feet long and 17 feet wide at the rear, with surrounding fence some 5½ to 6 feet high. The loading chute from same was about 15 feet long and 4 feet wide. The respondent and his men, having assumed the positions described, proceeded with the usual arguments invoked under such circumstances to persuade the steers in question to hasten through the loading chute into the car spotted on the track for their reception; but the steers churned and charged as they were bunched into the chute end of the pen, and in so doing one of them caught and pinned the leg of the respondent on the inside of the pen fence, and for injuries thus sustained plaintiff instituted an action against this appellant in September, 1911, contending that appellant was negligent and liable to him because it failed to have and maintain a running board around the top of the pens; and upon trial had at Baker, in December, 1911, verdict and judgment for $6,000 against the appellant resulted, from which judgment defendant appeals.                    AFFIRMED.

For appellant there was a brief over the names of *Mr. William W. Cotton, Mr. Arthur C. Spencer, Mr. Charles A. Johns* and *Mr. Charles E. Cochran,* with an oral argument by *Mr. Cochran.*

For respondent there was a brief over the names of *Messrs. Clifford & Correll,* with an oral argument by *Mr. Morton D. Clifford.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. Was the defendant negligent in maintaining its loading pens without a running board? Under Article VII, Section 3, of the constitution, as amended in 1910 (Laws 1911, p. 7), if there is any evidence to support

plaintiff's contention of negligence in this respect, we
are precluded from disturbing the verdict.   From the
testimony adduced by plaintiff we are advised that the
top of the loading pen is 5 or 6 feet from the ground,
and that superimposed upon this a plank 2 by 12 or 2
by 14 inches is spiked to the top of the posts, which plank
is called a running board, and is placed in that position
for the purpose of assisting the shipper to load stock
without exposing himself to danger; that by means of
such running board the shipper, or his assistants, could
stand above the stock with a prod pole, and scare or
drive the cattle into the loading chute without danger
to himself; that without such board it would often be
necessary for him, in order to force stock into the loading
chute, to take a position on the top of the fence, which
would necessarily expose him to more danger from the
frightened stock; that it is usual and customary for rail-
roads to provide such running boards for their corrals
and loading pens; that, in the absence of such running
boards, one must get on the fence in some way in order
to force the stock into the loading chute; that most of
the loading pens of defendant, including the one in ques-
tion, were originally equipped with running boards, but
that these were taken off the pen in question by the yard-
master in charge about two years before; that plaintiff
thereafter notified the yardmaster that it was dangerous
to load stock from the pen with the running boards re-
moved, and requested him to replace them, which request
was refused; that upon the day the accident happened
it was necessary for plaintiff to get on top of the fence
to prod the steers in order to force them into the chute,
and that, in doing so, in order to maintain his position,
he sat upon the top board of the fence, astride, with one
foot inside, and while trying to force the steers into the
chute, a heavy animal backed against his foot, catching
it between its rump and the fence, and crushed and

twisted it so as to seriously injure and disable him. The defendant's testimony contradicted that above stated in many particulars, but by reason of the amendment above cited we are precluded from inquiring into the comparative weight of the testimony.

On the case made by plaintiff we think there was testimony sufficient to justify submitting to the jury the question of defendant's negligence.

2, 3. It is settled law in this country that carriers of live stock are common carriers. Thompson, Negligence, § 6576. As such, it is their duty to provide suitable and necessary means and facilities for receiving and loading stock presented for shipment. Thompson, Negligence, § 6579; 6 Cyc. 440; *Covington Stockyards Co.* v. *Keith,* 139 U. S. 128 (11 Sup. Ct. 469: 35 L. Ed. 73) ; *Buck* v. *O. R. & N. Co.;* 53 Wash. 113 (101 Pac. 492) ; *Mason* v. *Missouri Pacific R. Co.,* 25 Mo. App. 473. Such liability is not waived or shifted to the shipper by his attempting to load or unload through his own servants. Thompson, Negligence, § 6581.

4. The negligence of the defendant in not furnishing plaintiff suitable and safe facilities for loading his stock being established, the next question that presents itself is, Was such negligence the proximate cause of the injury? It may be premised that the jury with all the evidence before them were the proper judges and had a right to find whether or not, in view of all the circumstances, this accident would have happened had a running board been provided for the convenience and safety of plaintiff while loading his stock; and a fair review of the evidence will, we think, satisfy any unprejudiced mind that under such conditions such injury would not have occurred. As links in the chain of causation leading up to plaintiff's injury, we find indicated by plaintiff's testimony this state of facts: Plaintiff was properly and necessarily seated astride of the fence in order to force

his cattle into the chute. By reason of the absence of a running board, he was compelled, in order to retain his position, to place his leg and foot inside the pen where the stock in their natural efforts to avoid being forced into the chute might, and in fact did, crowd themselves against his exposed foot, and cause the injury complained of. Under these circumstances we think the negligent act of defendant was the proximate cause of the injury.

5. Perhaps no term used in the law has been defined so frequently and diversely as the phrase "proximate cause." Taking the words literatlly, they would indicate, perhaps, the nearest cause in point of time to the particular event produced; but such is not their legal signification. The following definitions are deemed fairly accurate: "Proximate cause" is probable cause. *Armour* v. *Golkowska,* 202 Ill. 144 (66 N. E. 1037) ; *Watson* v. *Dilts,* 116 Iowa, 249 (89 N. W. 1068: 57 L. R. A. 559: 93 Am. St. Rep. 239). By "proximate cause" is not meant the last act of cause or nearest act to the injury, but such act, wanting in ordinary care, as actually aided in producing the injury as a direct and existing cause. It need not be the sole cause, but it must be a concurring cause such as might reasonably have been contemplated as involving the result under the attending circumstances. *Gonzales* v. *City of Galveston,* 84 Tex. 3 (19 S. W. 284: 31 Am. St. Rep. 17). Proixmate cause is such cause as would probably lead to injury and which has been shown to have led to it. It need not appear from the evidence that the injuries complained of. resulted instantly and immediately from the negligence. The law regards the one as the proximate cause of the other without regard to the lapse of time where no other cause intervenes or comes between the negligence charged and the injuries received to contribute to it. There must be nothing to break the causal connection between the alleged negligence and the injuries. *Henry* v. *Cleveland,*

*C., C. & St. L. R. Co.* (C. C.) 67 Fed. 426. In *Lane* v. *Atlantic Works*, 111 Mass. 136, Colt, J., defining "proximate cause," uses this language:

"In actions of this description, the defendant is liable for the natural and probable consequences of his negligent act or omission. The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended. The act of a third person intervening and contributing a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise."

The case of *Kincaid* v. *K. C., C. & S. Ry. Co.*, 62 Mo. App. 365, is one similar in many respects to the case at bar. There the plaintiff was driving his cattle up a chute in order to load them upon defendant's car. Ice had been negligently allowed to accumulate upon the chute to the extent that it had become slippery and dangerous. One of the cattle slipped against another, causing it to fall on plaintiff's leg, thereby breaking it. There, as here, the defendant claimed that the icy condition of the chute was not the proximate cause of the injury. The court, among other things, said:

"It was the duty of the defendant to furnish plaintiff with a reasonably safe means of loading his cattle; and, having provided a chute for that purpose, it was its duty to keep the chute in a reasonably safe condition. * * Was the dangerous condition of the chute the proximate cause of the injury to plaintiff? We answer this in the affirmative. If the steer which first slipped had been injured, the result being directly caused by the ice, it is quite apparent the defendant would have been liable for the damage. Is the result to plaintiff in having his leg broken

any the less the direct and proximate result, simply for the reason that the first steer slipped against another, causing the latter to fall on plaintiff and break his leg? The fact that a connected series of causes caused the injury will not prevent the primary cause from being the proximate cause, in a case where no independent cause intervenes. Here the slipping of the first steer against the second was caused by the ice. The slipping of the first steer against the second caused the second to slip and strike the plaintiff. The resulting causes were the natural and immediate sequence of the first cause, as much so as the toppling of the first pin in a row causes the fall of the last one."

So in the case at bar, what was the object of having a running board upon the top of the fence? From the testimony adduced by plaintiff the answer must be to protect the lives and limbs of persons loading the cars from the natural struggles of cattle being loaded on the cars. What was the result of taking off the running board? This, that defendant's limbs were not protected, and in the struggles of the cattle caused by their well-known reluctance to being driven up an inclined chute and into a car defendant was injured. The chain of causation from the negligence shown to the injury received seems to us to be complete.

6. The contention that plaintiff was guilty of contributory negligence in occupying the position taken by him at the time of the injury cannot be sustained. He had either to use such instrumentalities as the company furnished him, or fail to ship his stock. As was said in *Kincaid* v. *K. C., C. & S. Ry. Co.*, 62 Mo. App. 365:

"It is not fair to a shipper, who is not on even terms with the carrier, to offer to him a means of shipment and then because he accepts the means to say he is negligent. The shipper is not in a situation where he can refuse to ship, and the law will not look at the relation of the shipper as being altogether voluntary."

To the same effect, see *White* v. *Cincinnati, etc., Ry. Co.,* 89 Ky. 478 (12 S. W. 936 : 7 L. R. A. 44).

7. Evidence that the use of running boards was a usual and customary precaution on other roads was clearly admissible. Negligence is the failure to do what an ordinarily prudent person would have done under the same circumstances; and evidence that other roads similarly situated took the precaution to use running boards, and that they were in common and general use, was certainly some evidence that the failure to use them was a lack of that diligence which ordinarily prudent carriers use to protect shippers. We do not say that it is conclusive evidence because a common custom may itself be dangerous, but that a certain precaution is one ordinarily used is surely evidence both for or against a person charged with a lack of ordinary care.

8. Error is predicated upon the ruling of the court permitting plaintiff to testify that at some time previous to the accident he notified defendant's yardmaster that the absence of running boards on these pens was a probable source of danger and requested him to replace them, and that this request was refused. The evidence elicited tended to show that Thompson had charge of the pens and carried the key thereto, and was the person who had removed the running boards, which removal was about two years before the accident. We think that for all purposes connected with the management of the pens this testimony tended in some degree to indicate that Thompson was a vice-principal, and that notice to him was notice to the company. He was the visible agent of the company at the yards—the person to whom a shipper would naturally apply when any question arose as to their condition, and the court did not err in admitting the evidence.

9. It is also claimed that the court erred in admitting the testimony of J. G. Kidwell, to the effect that the

year previous to the accident plaintiff had bought cattle for him upon commission, and that what he had earned in this way amounted to $4,000. No binding or continuing contract was shown between plaintiff and Kidwell, and his purchases were generally submitted to Kidwell upon being finally closed, though the evidence indicated that he was still working under the common arrangement when the accident happened. Plaintiff's testimony tended to show that his business was that of buying cattle, and that by this accident he had been permanently disabled from carrying on such business, which required him to ride on horseback from place to place in search of stock, and that his earning capacity had been entirely destroyed.

The question of earning capacity is a difficult one. What a man will be able to earn in the future and his capacity to "make good" is to a great extent to be ascertained by what he has achieved in the past. It is true that plaintiff had no fixed salary and no fixed term of employment, but he had a definite line of business by means of which he had been able to earn $4,000 the year previous to the accident. Few persons having a fixed salary have an absolute assurance that it may not be reduced, or that the position occupied may not be lost, and few persons in any business have a definite knowledge of what may be the result of its variations; but the fact that for the year previous to the accident the plaintiff, by his energy and capacity as a stock buyer, had been able to earn $4,000, certainly tended to throw some light upon the question of his capabilities in that vocation; and the admission was not erroneous. The cases cited by defendant to sustain its view of the last contention are: *Hoskins* v. *Scott,* 52 Or. 271 (96 Pac. 1112) ; *Boston, etc., Co.* v. *O'Reilly,* 158 U. S. 334 (15 Sup. Ct. 830 : 39 L. Ed. 1006) ; *Diamond Rubber Co.* v. *Harryman,* 41 Colo. 415 (92 Pac. 923) ; *Haas* v. *St. Louis, etc.,*

*Co.*, 128 Mo. App. 79 (106 S. W. 599). In all these cases there existed elements of speculation and uncertainty not found in the case at bar. In *Hoskins* v. *Scott,* 52 Or. 271 (96 Pac. 1112), the action was for damages for breach of a contract to furnish an engine and an engineer to run a threshing machine for a certain year, and the claim was for loss of profits. The only evidence introduced by plaintiff to show what such profits would have amounted to was that a number of people in the vicinity had asked him to do threshing for them during the summer, and had told him that, if he brought his machine to their farms and did good work, he should have their threshing to do, and that nothing more definite was said about it further than that one person told him that he would pay him five cents a bushel, and another told him that there were about "20,000 bushels on the sticky run" that year. It was held that such evidence was too remote and speculative, as, indeed, it was; there being no evidence of the amount of grain that could have been available for threshing, except the single hearsay statement in regard to the 20,000 bushels and the single offer of one person to pay five cents a bushel for threshing an indefinite number of bushels. It will be noticed, too, that the action was not for damages caused by loss of earning capacity, but for loss of prospective profits, between which two actions the rule of evidence is widely different. In *Boston & Albany R. Co.* v. *O'Reilly,* 158 U. S. 334 (15 Sup. Ct. 830: 39 L. Ed. 1006), the plaintiff, to show loss in and interruption of his business by reason of an injury received at the hands of defendant, was permitted to make an estimate of the annual value of his labor, based upon the business of a steam thresher in which he, at one time, had owned an interest, but with which he had parted before he received his injuries. This was held too remote and indefinite. The other cases cited contain many elements

of uncertainty not found in the case at bar. The line between that evidence, which is wholly speculative and uncertain, and therefore inadmissible, and that which is sufficiently definite to be admitted, is exceedingly close in the decided cases.

10. A fair rule would seem in cases of this character to be that any evidence which would indicate fairly the capacity of the plaintiff to earn money in his usual vocation, and the probability of his being able to do so in the future should be admitted; but, where such evidence consists of mere guesswork and speculation upon what might happen in the future, it should be excluded. Such testimony in any court is seldom, or never, conclusive, and merely furnishes one factor in solving the equation of a man's earning capacity.

11. Whether under the circumstances defendant should be held to have received the property when it allowed it to be placed in the pens is of no moment as it certainly accepted it for shipment when it gave permission to load it on their cars.

Many exceptions are taken to the instructions of the court, but, after a careful examination of these, we are satisfied that the charge as a whole admirably and fairly stated the law. That we do not discuss these exceptions in detail is not due to the fact that the arguments urged in their favor are not ably and plausibly presented, but to the circumstance that in the crowded condition of our docket it is impracticable to consume the time of the court in the editorial work of preparing an opinion discussing each objection separately to the delay and detriment of other cases equally worthy of consideration. An exception is noted to the refusal of the court to give the following instruction requested by defendant:

"If you find that defendant has used ordinary care to see that the cattle pen in question was reasonably suitable to use in loading cattle, the defendant was not negli-

gent if it failed to build or maintain as a safety device a running board which might have prevented the particular accident in question had it been in use."

We think these points substantially covered in instructions 9, 15, and 16. These instructions clearly indicate to the jury that no particular form of device or protection is necessary if the pens are reasonably safe and suitable.

12. In a case of this length and hotly contested, as it evidently was, it is next to impossible for a trial court to avoid trifinig and technical error. If from the whole record it appears that the parties had a fair trial, and were given an opportunity to present the case on its merits, and that the result was not such as would indicate that any error committed occasioned an unjust verdict, the judgment should not be lightly set aside.

The judgment is affirmed.                AFFIRMED.