Argued and submitted June 12, judgment reversed and remanded in part; otherwise affirmed August 2, 1995, petition for review denied February 13, 1996 (322 Or 613)

## Shirley C. WOOTON,
*Appellant,*

*v.*

## VIKING DISTRIBUTING CO., INC.,
Dorothy Smith and La Rue Smith,
*Respondents.*

## (92-3593-L-3; CA A85485)

899 P2d 1219

Joseph M. Charter argued the cause for appellant. With him on the briefs was Werdell, Charter & Hanson.

Ervin B. Hogan argued the cause for respondents. With him on the brief were Joseph E. Kellerman and Blackhurst, Hornecker, Hassen & Ervin B. Hogan.

Elizabeth McKanna and Bennett & Hartman filed an *amicus curiae* brief for Oregon Trial Lawyers Association.

Before Landau, Presiding Judge, and Leeson and Armstrong, Judges.

LEESON, J.

### LEESON, J.

Plaintiff appeals from a judgment entered in favor of defendants Viking Distributing Company (Viking) and Dorothy Smith, Viking's corporate secretary and plaintiff's supervisor.[1] She assigns error to the trial court's grant of defendants' motions for a directed verdict dismissing her claim for breach of contract, and judgment notwithstanding the verdict on her claim of statutory wrongful discharge in violation of ORS 659.410(1), entered after a jury awarded her $141,000 in economic damages and $20,000 in noneconomic damages. Defendants cross-assign error to denial of their motion to remove from jury consideration plaintiff's prayer for loss of future earnings and benefits. We reverse on the claim for statutory wrongful discharge and otherwise affirm.

Plaintiff responded to a newspaper ad and was hired to work at Viking in January 1976, after a brief interview with defendant and La Rue Smith. She did general office work for more than 16 years, until she resigned in August 1992. At that time, she was earning $1,360 per month, plus fringe benefits that included medical insurance, annual bonuses, and profit-sharing and retirement plans. She alleges that a series of incidents over the course of several days compelled her to resign. Plaintiff and defendant presented widely disparate accounts of what occurred, but several facts are undisputed.

On Friday, August 14, 1992, plaintiff slipped and fell on the floor in the office kitchen. Despite an obvious injury to her knee, she remained at work for the rest of the day. Defendant learned that plaintiff had fallen by overhearing plaintiff's conversation with another employee. Plaintiff worked all day on Monday, August 17. That evening, plaintiff's daughter convinced her to visit a doctor. On Tuesday morning, plaintiff gave defendant a written note, informing her that plaintiff had scheduled a doctor's appointment during the lunch hour. Plaintiff's daughter provided transportation to and from the doctor's office. The doctor diagnosed a knee sprain, fitted plaintiff with a leg brace and released her to work. On the way back to work, plaintiff picked up a

---

[1] Claims against defendant La Rue Smith, Viking's president, were dismissed during trial. When we refer to defendant in the singular, we mean Dorothy Smith.

workers' compensation form. When plaintiff presented that form to defendant, a brief discussion ensued and defendant told plaintiff to take the rest of the afternoon off. Defendant telephoned plaintiff at home that evening. On Wednesday morning, plaintiff called defendant to report that she would not be at work that day because her leg was hurting. She called in again on Thursday morning to report that she would not be at work. Thursday afternoon, plaintiff called defendant to inform her that she had decided to resign. The two briefly discussed the vesting of plaintiff's retirement plan and the return of plaintiff's office key.

Plaintiff's subsequent efforts to find comparable employment were unsuccessful. After submitting 59 applications over the course of nine months, she secured only part-time employment at $4.75 per hour, with no fringe benefits.

The first issue on appeal is whether the trial court erred in granting defendants' motion for a directed verdict on plaintiff's claim that defendants breached an oral contract for lifetime employment. Defendants contend that no such contract existed. Plaintiff argues that an implied contract for lifetime employment was formed during her initial employment interview in January 1976.

In reviewing the grant of defendants' motion for a directed verdict, we view the evidence in the light most favorable to plaintiff and give her the benefit of every reasonable inference. *Shockey v. City of Portland*, 313 Or 414, 422, 837 P2d 505, *cert den* ___ US ___, 113 S Ct 1813 (1993). We will reverse the trial court unless the only reasonable inference that can be drawn from the evidence is that there was no promise by defendant of long-term employment. *Griffin v. K.E. McKay's Market of Coos Bay, Inc.*, 125 Or App 448, 451, 865 P2d 1320 (1993), *rev den* 319 Or 80 (1994). In determining if a contract exists, we examine the parties' objective manifestations of intent, measured by whether a reasonable person would construe a promise from the words and acts of the other. *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 354, 709 P2d 727 (1985). The general "American rule" is that employment for an indefinite time is *prima facie* employment at will, which either party can terminate at her pleasure, except under certain circumstances where the law recognizes

discharges to be wrongful. *Sheets v. Knight*, 308 Or 220, 229, 779 P2d 1000 (1989).

■ Plaintiff argues that because the newspaper ad placed by defendants stated "long term employee wanted" and because they talked about long-term employment and retirement benefits during the interview, she reasonably understood that she had a long-term contract. Plaintiff testified that

> "it was sort of generally agreed that I was already almost 40, that I could work there long term and retire from the company if all went well and if everyone was pleased with my work[.]"

Defendant acknowledges that she discussed long-term employment and retirement benefits with plaintiff, but contends that there was no evidence from which a jury could reasonably conclude that plaintiff was anything other than an at-will employee. She testified that it was in the company's interest to recruit employees who would at least "stay for a moderate length of time" to minimize the costs of training and retraining. She explained that fringe benefits, including a good retirement plan, help to retain employees. The trial court concluded "the only evidence is that it's an employment at will [and] [t]here is no evidence of a lifetime contract." Accordingly, it granted defendants' motion for a directed verdict on plaintiff's breach of contract claim.

We agree with the trial court that nothing in the evidence could reasonably be interpreted as a promise by defendant that created a contract for long-term employment. Plaintiff's recollections of defendant's statements at the interview cannot reasonably be construed as anything more than mutual hope. That plaintiff could remain in defendants' employ until retirement was, like all at-will employment, dependent on whether "all went well and if everyone was pleased." Moreover, the provision by an employer of a retirement plan does not, as plaintiff suggests, reasonably create the expectation that the employer promises a job to its employee until retirement. Nor does the provision of annual bonuses, a profit-sharing plan or periodic praise imply that a long-term contract has been formed. To conclude otherwise would virtually destroy the at-will employment doctrine or, conversely, force employers to eliminate many valuable forms

of compensation. The trial court properly granted defendants' motion for a directed verdict on plaintiff's breach of contract claim.

Plaintiff next assigns error to the trial court's grant of defendants' motion for judgment notwithstanding the verdict, ORCP 63, on plaintiff's claim, brought under ORS 659.121(2), that she was wrongfully discharged in retaliation for filing a workers' compensation claim, in violation of ORS 659.410(1).[2] Plaintiff alleges that, although she informed defendant that she was quitting, she had been constructively discharged.[3] Thus, plaintiff's claim involves two distinct issues: (1) whether she was constructively discharged, and (2) whether the discharge violated the statute. *See Bratcher v. Sky Chefs, Inc.*, 308 Or 501, 504, 783 P2d 4 (1989) ("wrongful constructive discharge" is not a "doctrine"; it entails proof of both constructive discharge and tortious wrongful discharge).

■ As a threshold matter, plaintiff and defendants disagree about our standard of review. Plaintiff relies on *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 356 n 8, 788 P2d 428 (1990), and Article VII (amended), section 3, of the

---

[2] ORS 659.410(1) provides, in part:

"It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 [regarding workers' compensation[.]"

ORS 659.121 provides, in part:

"(1) Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS 25.363, 399.235, 659.030, 659.035, 659.227, 659.270, 659.295, 659.330, 659.340, 659.410, 659.415, 659.420 or 659.425 may file a civil suit in circuit court for injunctive relief and the court may order such other equitable relief as may be appropriate, including but not limited to reinstatement or the hiring of employees with or without back pay. * * *

"(2) Any person claiming to be aggrieved by alleged violations of ORS 659.033(1) or (3), 659.295 or 659.400, 659.405, 659.410(1), 659.415 to 659.435 and 659.550 may file a civil action in circuit court to recover compensatory damages or $200, whichever is greater, and punitive damages. In addition, the court may award relief authorized under subsection (1) of this section and such equitable relief as it considers appropriate. At the request of any party, the trial of such case shall be by jury."

[3] The concept of constructive discharge, which asserts that a forced resignation can be a discharge, has been recognized in Oregon. *Sheets v. Knight*, 308 Or 220, 227 & n 3, 779 P2d 1000 (1989).

Oregon Constitution, for her argument that a judgment notwithstanding the verdict should be upheld only if there is no evidence to support the jury verdict. Defendants contend that a claim for lost wages resulting from unlawful employment practices brought under ORS 659.121 is equitable in nature and, therefore, requires *de novo* appellate review. *Seitz v. Albina Human Resources Center*, 100 Or App 665, 671-74, 778 P2d 1004 (1990).

■ We agree with plaintiff. Defendants' reliance on *Seitz* is misplaced. In that case the plaintiff had brought a claim for back pay under ORS 659.121(1), alleging that she had been constructively discharged by the defendant in retaliation for filing a race and sex discrimination complaint, in violation of ORS 659.030(1)(f). This court held that a request for back pay under ORS 659.121(1) is an equitable claim, even though the plaintiff did not seek injunctive relief. *Id*. at 673. This case involves an entirely different issue. Plaintiff's claim is under ORS 659.121(2), which grants a right of action for both legal and equitable relief and allows trial by jury. Plaintiff availed herself of that right and prevailed. We may not re-examine a jury's finding unless there is no evidence to support its verdict. Or Const, Art VII (amended), § 3. On appeal from a judgment notwithstanding the verdict, we view the evidence, including all reasonable inferences, in the light most favorable to the party with the verdict, and must reinstate the verdict unless there is no evidence to support it. *King v. All Pro Services, Inc.*, 120 Or App 479, 483, 852 P2d 943 (1993). We do not weigh the evidence, but rather resolve any conflicts in the evidence in favor of the party with the jury verdict. *Jacobs v. Tidewater Barge Lines*, 277 Or 809, 811, 562 P2d 545 (1977).

■ To establish that she was constructively discharged, plaintiff must prove that defendant deliberately created or maintained unacceptable working conditions with the intention of forcing her to resign, and that she quit because of those working conditions when otherwise she would have remained. *Bratcher*, 308 Or at 506. It is immaterial whether plaintiff's decision to quit was objectively reasonable, as long as the working conditions were the actual cause of the decision. *Id.*

■    Plaintiff claims that defendant

"deliberately created or maintained intolerable working conditions by verbally abusing plaintiff with the intention of forcing plaintiff to leave her employment, which plaintiff did on or about August 20, 1992."

Defendant disputes plaintiff's factual allegations. She further contends that she was entitled to a judgment notwithstanding the verdict because a jury could not reasonably find that plaintiff was constructively discharged: Plaintiff did not return to work after filing her workers' compensation claim and, thus, "there was no evidence that plaintiff was subjected to *any* working conditions" after she filed her claim. (Emphasis supplied.)

At trial, plaintiff and defendant presented markedly different versions of their conversations after plaintiff's fall in the office kitchen. The jury could reasonably have chosen to believe only one party and to totally discount the other's testimony. Consistent with our standard of review, we have searched the record to determine if there is evidence to support the verdict. *Jacobs*, 277 Or at 811.

According to plaintiff, when defendant learned of plaintiff's injury, defendant said, "Stay out of the kitchen, we can't afford it." Plaintiff knew that defendant frowned on employee absences. Moreover, over the years, plaintiff had adopted a conciliatory style to accommodate defendant's angry reactions to minor irritations. Plaintiff informed defendant by note about her doctor's appointment, because defendant "wasn't speaking to [her]" on the Monday and Tuesday after plaintiff's fall. When plaintiff returned from the doctor's office, she was afraid as she approached defendant to get a signature on the workers' compensation form, because "[defendant] was so angry looking, and I knew I was in trouble." Defendant paced around the office saying, "I'm not signing anything and I'm not filling anything out" and "we'll see about this." Defendant shouted to another employee, "I told you she'd do this," demanded that plaintiff use her regular health insurance instead of filing a workers' compensation claim and accused plaintiff of having hurt her leg elsewhere. Defendant knew that plaintiff would be forced to walk home when she told plaintiff to "take the afternoon

off." Plaintiff believed that defendant wanted her gone permanently and took the only personal possessions she had at the office — a pair of shoes — when she left. That evening, defendant telephoned plaintiff at her home and informed her that "we have called our attorney and we've called the [doctor's office]." After an exchange of sarcastic comments, defendant told plaintiff "to be at the office at 9:00 sharp Wednesday morning or we'll consider you quit." Plaintiff responded, "I don't quit." Defendant increased the pressure, demanding an immediate decision about quitting, reiterating that "filing comp causes serious problems," telling plaintiff that "if you don't call us by 10:00 [p.m.], we'll consider you quit" and again, repeatedly demanding to know, "Are you quitting?" After calling defendant to report her absence the next two days and discussing the matter with her son, plaintiff decided that she could not return to work and resigned.

If believed by the jury, the foregoing tale demonstrates that defendant acted deliberately to make plaintiff uncomfortable about her decision to file a workers' compensation claim. Further, a jury could find that when defendant was unable to convince plaintiff to use her regular health insurance, defendant's hostility toward plaintiff escalated to include accusations, ultimatums, harassment at home, and repeated suggestions that plaintiff should quit. A jury could reasonably infer that defendant acted with the intention of causing plaintiff's resignation. Absent an express statement, such an inference may be the only possible proof of defendant's state of mind. *McCuller v. Gaudry*, 59 Or App 13, 17, 650 P2d 148 (1982). Plaintiff's testimony also allows a finding that plaintiff resigned solely because of defendant's conduct and otherwise would have returned to work.

Defendants' contention that plaintiff was not constructively discharged, because she was not subjected to *any* working conditions after filing her workers' compensation claim, is without merit. Defendant's displeasure with plaintiff commenced immediately on learning of plaintiff's injury. She reacted with hostility when plaintiff presented her with the workers' compensation form. She harassed plaintiff by telephone at plaintiff's home. Plaintiff's claim is not undermined by the fact that that conversation did not occur in the office. That defendant chose to extend her campaign against

plaintiff's filing of a workers' compensation claim into plaintiff's home could itself have been seen by the jury as an unacceptable working condition.

Additionally, both the timing and content of defendant's statements readily support the conclusion that her conduct was in reaction to plaintiff's filing of a workers' compensation claim. In short, there is evidence from which a jury could find that plaintiff was constructively discharged and that the discharge was in retaliation for filing a workers' compensation claim. The trial court erred in granting defendants' motion for judgment notwithstanding the verdict on her retaliatory discharge claim.

■ Defendants cross-assign error to the trial court's denial of its motion to withdraw from jury consideration plaintiff's plea for future earnings and fringe benefits, also known as "front pay." Defendants first argue that an at-will employee cannot recover front pay as a matter of law. Plaintiff responds that ORS 659.121(2) authorizes the award of front pay.

As previously stated, ORS 659.121(2) authorizes plaintiff to recover compensatory damages and any "appropriate" equitable relief in a trial to a jury. We have previously construed that statute to mean that compensatory damages include front pay. *Bednarz v. Bay Area Motors, Inc.*, 95 Or App 159, 161, 768 P2d 422 (1989).

Defendants contend, nonetheless, that an at-will employee should not be entitled to that statutory remedy. They contend that an award of front pay would provide plaintiff, an at-will employee, with a windfall because she would be receiving compensation for a period beyond the "time she legally has a right to be employed." They argue that, even if she were reinstated, plaintiff could be discharged the very next day "as long as the discharge was not unlawful." Additionally, they argue that the duration of at-will employment is uncertain, rendering any determination of front pay entirely speculative, because it

"assumes the employer will continue in business, that the employee will not be laid off; that the employee will not relocate or find a different job; that the employer will continue to give bonuses; that the employer will not discontinue

its medical insurance, pension, and profit sharing plans; *and countless other possibilities that occur all the time.*" (Emphasis supplied.)

Defendants' argument entails more speculation than the theory it seeks to impugn. It could be applied equally to life-tenured employees and, left unchecked, would swallow all claims for future losses.

■■  Defendants also argue that plaintiff's evidence at trial failed to prove with reasonable certainty the existence or amount of damages for loss of future earnings and benefits. Although plaintiff presented credible expert testimony by an economist who properly calculated the present value of projected lost earnings and benefits based on plaintiff's work life expectancy, defendant claims that plaintiff's net losses are purely speculative because she offered no testimony from a vocational expert that her current part-time earnings represent her earning potential.[4] Plaintiff replies that evidence presented at trial was sufficient to find the existence and amount of those damages.

■■■■  Damages for loss of future earnings must be established with reasonable certainty in the sense that the evidence must show both the existence and amount of net income loss. *Owens v. Haug*, 61 Or App 513, 517, 658 P2d 523, *rev den* 294 Or 792 (1983). It is proper to allow jury consideration of loss of earnings, if there is relevant, competent and sufficient evidence of that loss. *Conachan v. Williams*, 266 Or 45, 58, 511 P2d 392 (1973). Evidence of plaintiff's future earning capacity need not be capable of exact monetary determination, but must indicate " 'fairly the capacity of the plaintiff to earn money in his usual vocation, and the probability of his being able to do so in the future.' " *Id.* at 59 (quoting *Brown v. O.-W. R. & N. Co.*, 63 Or 396, 407, 128 P 38 (1912)). The usual method of proof is to compare actual earnings before and after plaintiff was harmed. *Id.* at

---

[4] Defendants sometimes use the term "future earning capacity." The more accurate description of their claim is that plaintiff failed to prove that she obtained optimum alternative employment or made reasonable efforts to do so. To the extent that defendants' argument would require a plaintiff in cases such as this to prove what is normally meant by "impaired future earning capacity," we do not endorse it. The issue in cases such as this is lost future earnings owed by the defendant, not impairment of the plaintiff's future earning capacity. However, because defendants' argument fails on its own terms in this case, we address it as presented.

60. Nonetheless, the jury must almost always speculate to some extent with respect to future earning capacity. *Id.* at 61. Expert testimony, making estimates and predictions about future events, may aid the factfinder, but the weakness of witnesses' testimony, expert or otherwise, can be explored by cross-examination or contrary evidence. *Wilson v. B. F. Goodrich*, 292 Or 626, 631, 642 P2d 644 (1982). To assess a plaintiff's future earning capacity, the jury must draw inferences from the available evidence, whether or not it is aided by expert testimony. *Id.* at 633.

In this case, plaintiff presented evidence that she diligently sought suitable employment for nearly a year. She applied for at least 59 jobs during that period and finally was hired for a position that requires substantially the same computer skills that she used when employed by defendants. Nevertheless, she earns $4.75 per hour and is employed only part time. She was 58 years old at the time of trial. Her continuing efforts to find other employment are punctuated by periods of discouragement. The jury could reasonably infer that her prospects for full-time employment are highly uncertain. Plaintiff's expert based his calculation of her loss of future earnings "on the assumption that [her present earnings] represents her future earnings capacity." On cross-examination, defendants questioned the validity of that assumption. Nonetheless, there is sufficient evidence from which the jury could reasonably determine her future earning capacity. Defendants had the opportunity to present expert testimony showing that plaintiff did not adequately mitigate her damages because of the existence of more lucrative employment prospects. They did not do so, leaving the jury to consider the evidence before it. The trial court did not err in denying defendants' motion to remove the question of front pay from the jury's consideration.

Judgment on claim for wrongful discharge reversed and remanded for entry of judgment on the verdict; otherwise affirmed.