Argued and submitted November 6, 1989, affirmed as to judgment against Leonard; reversed in part as to judgment against Condon Motors, Inc. and remanded with instructions; otherwise affirmed May 16, 1990

## BANK OF EASTERN OREGON,
*Respondent,*

*v.*

## GRIFFITH et al,
*Defendants,*

*and*

## LEONARD et al,
*Appellants.*

(2705-84; CA A60530)

792 P2d 1210

Garry L. Reynolds, Hermiston, argued the cause and submitted the brief for appellants.

William J. Kuhn, Heppner, argued the cause and submitted the brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

## ROSSMAN, J.

This is an action by plaintiff Bank of Eastern Oregon (Bank) to foreclose its security interest in collateral that allegedly belonged to defendants Griffith. The trial court granted judgment in favor of Bank, and defendants Leonard and Condon Motors (Condon), who claim competing interests in certain of the collateral, appeal.[1] On *de novo* review, we affirm in part and reverse in part.

The Griffiths operated a wheat and cattle ranch in Wheeler County. Over the years, Bank provided them with a revolving line of credit, secured by several security agreements. One of those agreements, signed March 10, 1980, granted Bank a security interest in crops, livestock and equipment, including after-acquired equipment and livestock and the proceeds and replacement thereof. Bank perfected that interest by filing a financing statement on March 19, 1980.[2]

Bank subsequently brought this foreclosure action. The trial court found that Bank had a valid lien on the collateral described; that the security agreement also covered Griffith's share of two calf crops, which he earned pursuant to a lease agreement with Leonard, but which he had applied to a debt that he owed Condon; and that certain items of equipment that the Griffiths had traded to Condon were covered by the security agreement, giving Bank an interest superior to Condon's. Accordingly, in addition to entering judgment against the Griffiths, it entered judgment against Leonard for $15,894.94, the value of Griffith's share of the calf crops, and against Condon for $14,342.25, including $2,500 assigned as the value of Griffith's interest in the traded equipment.

The first issue is whether the trial court erred in finding that Griffith owned a share of two calf crops from cattle leased from Leonard, thereby giving Bank a perfected security interest in the proceeds. Leonard concedes that, in the spring of 1982, he entered into an oral lease agreement with Griffith, which the parties reduced to writing on February 1, 1983. Under its terms, Griffith was to lease from

---

[1] Defendants Straub and defendant International Harvester Credit Corporation were dismissed by an earlier "Partial Judgment."

[2] Because Mrs. Griffith did not sign the financing statement, the trial court held that Bank's security interest in her interest in the equipment had not been perfected as to third parties. *See* ORS 79.4020. Bank has not cross-appealed. Accordingly, this appeal relates only to the interest of Mr. Griffith.

Leonard cows that were about to calf. In return for pasturing and caring for the cattle, Griffith would receive two-thirds of the calf crop, to be divided no later than October 15 of each year. All cows were to remain the property of Leonard, and all calves were to be branded with Leonard's brand when six weeks old, remaining his property until they were divided. The lease was to continue from year to year, unless terminated by either party.

Leonard argues, however, that, notwithstanding the terms of the written lease, Griffith never had an interest in the calf crop. Rather, according to Leonard, the parties agreed to apply Griffith's share of the proceeds from each calf crop to a debt that he owed Condon, a corporation solely owned by Leonard. That understanding is demonstrated, he asserts, by the fact that, in 1982 and 1983, he did not divide the calves after Griffith turned them over to him. Instead, he sold them and used the proceeds from Griffith's share as a down payment on equipment purchased by Griffith from Condon in February, 1983. Because Griffith never acquired rights in the calves, Leonard argues, the Bank's interest could not attach to the proceeds from their sale.[3]

---

[3] For a security interest to attach, value must have been given, and the debtor must have acquired rights in the collateral. ORS 79.2030 provides:

"(1) Subject to the provisions of ORS 74.2080 on the security interest of a collecting bank, ORS 78.3210 on security interests in securities and ORS 79.1130 on a security interest arising under ORS 72.1010 to 72.7250, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

"(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

"(b) Value has been given; and

"(c) The debtor has rights in the collateral.

"(2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones the time of attaching.

"(3) Unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by ORS 79.3060.

"(4) A transaction, although subject to ORS 79.1010 to 79.5070 on secured transactions, is also subject to ORS 83.510 to 83.680 on retail instalment contracts and ORS chapter 725 on small loans, and in the case of conflict between the provisions of ORS 79.1010 to 79.5070 and ORS 83.510 to 83.680 or ORS chapter

As the trial court pointed out, however, Griffith testified that his agreement with Leonard gave Griffith an interest in two-thirds of the calves and that he agreed sometime later to apply the proceeds from their sale to his account with Condon. We agree with the trial court that that testimony, viewed in conjunction with the terms of the written lease, supports the finding that Leonard agreed to give Griffith an interest in two-thirds of the calf crop as of October 15 of each year, then to sell his share and to apply the proceeds to his debt to Condon. Thus, whether or not the calves were divided on October 15 of each year, Griffith acquired an interest in two-thirds of the calf crop as of October 15, 1982, and 1983. Bank's security interest in after-acquired property attached at that time and, when the calves were sold, it retained a security interest in the proceeds. It follows that the trial court properly awarded Bank two-thirds of the proceeds from the 1982 and 1983 calf sales.

The second issue is whether the trial court erred in granting judgment against Condon for the value of Griffith's interest in equipment that he and Mrs. Griffith traded in. The trial court apparently reasoned that when, on June 1, 1981, the Griffiths purchased some used farm machinery from Condon, using as their down payment certain equipment in which Bank already had a security interest under the 1980 agreement, Bank's interest attached to the new farm machinery, because it was proceeds, replacement or after-acquired equipment. ORS 79.3060. Although Condon had obtained a purchase money security interest, it did not perfect it by timely filing a financing statement. Thus, Bank had an interest in the equipment superior to Condon's.

Condon argues, however, that Bank waived its security interest in the traded equipment. According to Condon, Bank gave Griffith permission to trade the equipment. Later, when the Griffiths renewed their operating loan, Bank crossed the traded equipment off the list attached to the 1980 agreement. On September 15, 1981, when the Griffiths visited the bank to sign a new security agreement, it had deleted the

---

725, the provisions of ORS 83.510 to 83.680 or ORS chapter 725 control. Failure to comply with any applicable statute has only the effect which is specified therein."

Leonard concedes that value was given.

traded equipment from the list of described collateral.[4] Finally, it wrote the word "traded" on the 1980 security agreement next to each piece of equipment traded. Those actions, Condon argues, constitute an affirmative waiver of Bank's interest in the equipment.

■■ There was conflicting evidence as to whether Bank consented to the trade. Although Griffith testified that he talked to Pierce, a bank officer, before trading the equipment, Pierce denied consenting to the trade. According to Bank, it did not learn of the trade until 1981, when, in the process of renewing their operating loan, the Griffiths informed a bank officer of that fact. Thus, it contends, it did not affirmatively waive its security agreement, but simply acquiesced in an accomplished fact. Moreover, it argues, the Griffiths' failure to obtain its consent before trading the equipment violated the security agreement, giving Bank the right to foreclose or to require an accounting. Pointing out that section 7.6 of the 1980 agreement provides that "[n]o delay in exercising the secured party's rights shall be a waiver * * *," it argues that its failure to take those steps was not a waiver, but simply a failure to pursue its remedies when they first became available.[5] With respect to the issue of consent, the trial court apparently found Pierce's testimony more credible than Griffith's. That is a troubling finding, given that the court found Griffith more credible than Leonard regarding the parties' intent as to the calf agreement. However, we need not decide whether Bank consented to the trade, because we find that its other affirmative actions were sufficient to demonstrate a waiver of its interest in the equipment.[6]

"[A] security agreement is first of all a contract

---

[4] Defendants do not contend that the 1981 security agreement revoked or rescinded the 1980 agreement.

[5] The 1980 agreement also provided that the "[s]ecured party shall not be deemed to have waived any of his rights under this * * * agreement * * * unless the waiver is in writing signed by the secured party." That provision, however, like any other contract term, may be waived by a party. In this case, Bank effectively waived the requirement of a signed writing through its unequivocal actions altering the security agreement.

[6] The dissent mischaracterizes the critical inquiry as "whether Bank consented to the trade *before* it took place." 101 Or App at 534. (Emphasis in original.) The only pertinent inquiry is whether Bank's actions manifested a clear intention to relinquish its rights in the traded equipment. *See Smith v. Martin,* 94 Or 132, 142, 185 P 236 (1919). There is no basis for concluding that the only way that it could do that was by consenting to the trade before it occurred.

between debtor and creditor * * *." *Community Bank v. Jones,* 278 Or 647, 659, 566 P2d 470 (1977). As is true of any contract, "a party * * * may waive performance of any of its provisions if he so chooses." *Cross v. Campbell,* 173 Or 477, 493, 146 P2d 83 (1944). Because waiver is the "intentional relinquishment of a known right," *Smith v. Martin, supra* n 6, 94 Or at 142, a party's intent to waive must be manifested by clear and unequivocal action. It may be proved, however, "by parol and by circumstantial evidence, as well as by direct testimony." *Smith v. Martin, supra* n 6, 94 Or at 138. That is, it may be express or implied from the conduct of the secured party.

It is undisputed that Bank drew a line through all references to the traded equipment on its security agreement, deleted the equipment from the 1981 security agreement less than six months after the trade and later wrote "traded" on the 1980 security agreement next to each piece of equipment traded. Those separate actions suggest more than "mere acquiescence" or "delay in exercising its rights." They constitute strong circumstantial evidence that Bank intentionally relinquished its interest in those items. Moreover, Bank never adequately explained why it found it necessary or advisable to alter the face of the security agreement. On *de novo* review, we find that an intentional waiver is the only reasonable explanation. It follows that the judgment against Condon must be reversed with respect to the traded equipment.

Affirmed as to judgment against Leonard; reversed as to judgment against Condon Motors, Inc., with respect to inclusion of the value of the equipment traded in 1981 and remanded with instructions to enter correct judgment; otherwise affirmed.

**BUTTLER, P. J.,** concurring in part; dissenting in part.

I concur in affirming the judgment against Leonard, but because I disagree with the majority's conclusion that Bank waived its perfected security interest in the equipment that Griffith traded to Condon Motors, I dissent from the reversal of the judgment against Condon.

Given Condon's argument, a critical question is whether Bank consented to the trade *before* it took place. The majority recognizes the importance of that inquiry, 101 Or

App at 533, and, after discussing it, begrudgingly defers to the trial court's finding that there was no prior consent by Bank. However, it concludes that we need not decide that question, because at some time *after* the trade, Bank crossed off the traded equipment on a copy of the 1980 financing statement. However, not even Condon would have us go that far; it relies on the prior permission of Bank, coupled with the later crossing out as showing a waiver by Bank.

Three witnesses testified on the waiver issue: Griffith and two bank officers, Pierce and Pierson. Griffith was uncertain as to both the time and content of his conversation with Pierce. The best that he could say was that he was "sure" that he had told Pierce, because "it's pretty hard to get anything by Gene Pierce and the bank." Even so, he could not remember *when* that was. On the other hand, Pierce's testimony relating to consent was clear and unequivocal—he had never consented to the trade. Pierson testified that, to the best of his knowledge, no one at the bank gave permission to Griffith to trade the equipment and that, had he been asked, he would not have consented. As between Griffith and Bank's officers, the trial court believed the latter.

The trial court found:

> "The equipment was specifically listed on the security agreement between the bank and Griffiths executed on March 10, 1980. In the fall of 1981, Griffiths came to the bank to renew their operating loan. A bank officer crossed the traded equipment off that listed in the 1980 agreement, as Griffiths told him it was traded. On September 15, 1981 they signed a different security agreement in which the traded equipment was deleted. In late 1983 or early 1984, a different bank officer made the notation 'traded' on the 1980 agreement, next to the crossed out items."

It is clear that the court did *not* find that Bank had consented to the trade; it found that Bank had learned of it after the fact and had noted that fact on a copy of the 1980 security agreement. The trial court implicitly found that whatever Griffith had to say on the subject was so vague and indefinite that it could not support a finding that Bank had consented to the trade or that, even if his testimony could support such a finding, it was not as credible as that of Bank's officers, Pierce and Pierson.

Waiver is an affirmative defense, and the party asserting it has the burden of proof. ORCP 19B. Waiver is a voluntary, intentional relinquishment of a known right. *Cross v. Campbell,* 173 Or 477, 493, 146 P2d 83 (1944); *Puziss v. Geddes,* 96 Or App 154, 158, 771 P2d 1028 (1989). It is primarily a question of intent, which may be express, such as by a written release under ORS 79.4060, or implied from the conduct of the secured party. However, the intention to waive must clearly appear; it will not be inferred, except from a clear and unequivocal act manifesting an intent to waive. *Smith v. Martin,* 94 Or 132, 141, 185 P 236 (1919). There is no evidence of a clear and unequivocal act that manifests Bank's intention to waive its security interest. Condon has not sustained its burden of proof.

There are other reasons why there was no waiver. Section 7.6 of the security agreement provides:

"Non-Waiver by Secured Party

"Secured party shall not be deemed to have waived any of his rights under this or any other agreement or instrument signed by the debtor *unless the waiver is in writing signed by the secured party. No delay in exercising the secured party's rights shall be a waiver* nor shall a waiver on one occasion operate as a waiver of such right on a future occasion." (Emphasis supplied.)

Any waiver of Bank's security interest had to be in writing; there was no written waiver. Further, the parties agreed that Bank's delay in exercising its rights would not operate as a waiver. Although there may be circumstances under which Bank would be estopped from relying on the non-waiver provision, no estoppel is claimed here. Neither is there any contention that Bank accepted any benefits, if there were any, from the trade of the equipment. *See Smith v. Martin, supra.*

In an analogous case, the Supreme Court relied on the parties' agreement in disposing of the defendants' contentions that the secured party had "abandoned" or waived its security interest. In *Community Bank v. Jones,* 278 Or 647, 566 P2d 470 (1977), the defendants argued that the bank had waived its perfected security interest in the debtor's automobile inventory, originally evidenced by a security agreement, by later accepting trust receipts on the vehicles. The

security agreement included after-acquired inventory and proceeds and expressly provided that any waiver of its security interest had to be in writing. The court, in finding no waiver, stated that "[w]here an agreement is clear upon its face, a court should be hesitant to infer waiver from the post-agreement conduct of the secured creditor." 278 Or at 669. The same is true here.

Neither does Bank's inaction after it learned of the trade amount to a waiver of its security interest. Although the UCC does not deal with waiver of security interests, as such, ORS 79.2050 provides, in part:

> "A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral * * * or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral."

Here, Bank did not object to the Griffiths' trading the equipment when it learned of it after the fact. Clearly, it could have done so, because the trade-in violated the security agreement. It could have foreclosed or it could have required an accounting; it was, however, not required to do either in order to retain its security interest. Condon took the equipment subject to Bank's security interest, and Bank did not release it. Condon does not contend that it relied on Bank's having waived or released its interest. Accordingly, unless there was some reason why Bank was concerned about the Griffiths' creditworthiness at the time when it was considering renewing its line of credit, there was no reason for Bank to take any action. Under ORS 79.2050, Bank's after-the-fact acquiescence in the trade-in did not invalidate its security interest.

Bank's conduct here was equivocal and ambiguous at best. There is no evidence that Bank did any more than acquiesce in the trade-in after the fact and note that the Griffiths no longer had possession of the traded equipment. Because its security interest had been perfected by the filing of a financing statement that covered *all* equipment and machinery, without describing any of it, including replacements and proceeds, the Griffiths' lack of possession did not affect Bank's security interest. Failure to list the equipment in

the 1981 agreement was also nothing more than an acknowledgment that the equipment was no longer in the debtor's possession. As noted, the financing statement perfected Bank's security interest in *all* equipment, including proceeds, replacements and after-acquired property. Furthermore, Bank did not file a termination statement of the 1980 agreement[1] or record a release of its security interest in the traded equipment. In fact, this action is based on *that* security agreement. As the trial court stated, the evidence shows only that Bank failed to pursue a remedy when it first became available. It was not required to pursue it. There was no waiver, and the trial court properly awarded Bank a one-half interest in the traded equipment.

I would affirm the trial court's judgment in its entirety and, therefore, dissent.

---

[1] Defendants do not contend that the 1981 security agreement revoked or rescinded the 1980 agreement on which plaintiff based this action.