Argued and submitted April 11; resubmitted In Banc September 4, reversed in part; affirmed and remanded for new trial in part; otherwise affirmed September 17, 1997

Darrell A. BENNETT,
*Appellant,*

*v.*

FARMERS INSURANCE COMPANY OF OREGON,
an Oregon corporation;
Farmers Insurance Exchange;
Truck Insurance Exchange; Fire Insurance Exchange;
Mid-Century Insurance Company;
Farmers New World Life Insurance Company;
and Farmers Group, Inc.,
aka Farmers Underwriters Association,
*Respondents.*

(9308-05432; CA A89477)

945 P2d 595

Marc Zwerling argued the cause for appellant. With him on the briefs were Ridgway K. Foley, Jr., Gary J. Lekas and Foley & Duncan.

James N. Westwood argued the cause for respondents. With him on the brief were Craig D. Bachman, Miller, Nash, Wiener, Hager & Carlsen and Lane Powell Spears Lubersky.

EDMONDS, J.

Armstrong, J., concurring in part, dissenting in part.

64-b

**EDMONDS, J.**

Plaintiff appeals after the trial court granted judgments notwithstanding the verdict (JNOVs) and, alternatively, a motion for a new trial, ORCP 63 C, on breach of contract, breach of fiduciary duty, and breach of duty of good faith and fair dealing claims. ORCP 63 C. After a two-month jury trial, the jury returned verdicts in favor of plaintiff for $3.5 million for breach of contract against all contracting defendants,[1] $750,000 compensatory damages for breach of fiduciary duty against Farmers Insurance Company of Oregon (FICO) and Farmers Group, Inc. (FGI), $750,000 compensatory damages for breach of good faith and fair dealing against FICO and FGI, and $35 million punitive damages against FICO and FGI. The trial court entered judgments in favor of plaintiff in accordance with the verdicts, and then subsequently entered JNOVs. Plaintiff seeks reinstatement of the judgments in his favor. We reverse the JNOV on the contract claim and remand for a new trial. Otherwise, we affirm.

Because this appeal comes to us on JNOVs, we do not reexamine the jury's findings, nor do we reweigh the evidence. *Jacobs v. Tidewater Barge Lines*, 277 Or 809, 811, 562 P2d 545 (1977). All evidence, and every reasonable inference from the evidence, must be viewed in the light most favorable to plaintiff. *Wooton v. Viking Distributing Co., Inc.*, 136 Or App 56, 62, 899 P2d 1219 (1995), *rev den* 322 Or 613 (1996). Our inquiry is to ascertain whether the record contains any evidence that supports the verdicts.

In 1981, FGI and FICO solicited plaintiff to terminate his insurance agency business and to enter into a new agreement under which he would recruit and train insurance agents to sell the contracting defendants' insurance policies. All defendants, except FGI, are insurance companies. FGI is the management company that acts on behalf of the defendant insurance companies and with whom plaintiff dealt

---

[1] The contracting defendants are Farmers Insurance Company of Oregon, Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and Farmers New World Life Insurance Company.

throughout his relationship with defendants. Subsequently, the contracting insurance companies entered into a "district manager's agreement" (Agreement) with plaintiff in September 1981. FGI is not a party to the Agreement. Under the Agreement, plaintiff was characterized as an independent contractor. He maintained his own office, hired his own employees, paid his own business expenses and assumed all the risk of business losses and failure. The Agreement provided that "no control" would be exercised by the insurance companies over the time, place or manner in which plaintiff carried out the objectives of the Agreement and that the Agreement did not create an employer-employee relationship between plaintiff and the insurance companies. Plaintiff's office was located in the Portland metropolitan area, but he was entitled under the Agreement to recruit agents without any geographical restriction. Most importantly, the Agreement expressly provided that it could be terminated by defendants without cause.

Essentially, plaintiff's theory of the case is that defendants recruited him to become a district manager and that, after he had built a successful business, they terminated their relationship with him, thereby retaining the fruit of his investment in the business. From 1981 to 1993, plaintiff invested money in the business and worked to make it successful. Because district managers for the companies receive a percentage of all sales commissions generated by the insurance agents under their supervision, they enjoy the potential to earn annual incomes exceeding one million dollars. From 1982 to 1992, defendants' total gross profits from plaintiff's district exceeded $27 million. However, in 1993, FGI and FICO prepared an internal 150-page report proposing to terminate the Agreement. FGI's management approved the request, which directly led to defendants' termination of the Agreement. As a result, plaintiff brought this action. A central issue in this case is whether the parties' agreement, as it existed in 1993, permitted defendants to terminate without cause.

## CONTRACT CLAIM—JNOV

■ We first address the JNOV on plaintiff's breach of contract claim against all defendants except FGI. Plaintiff

alleges, in part, that those defendants violated the Agreement by terminating him without cause. Defendants answered that the Agreement expressly permitted them to terminate the Agreement without cause. Plaintiff replied with several theories: (1) that the "termination without cause" provision had been modified in 1985 to provide for termination only "for cause"; (2) that the companies had waived their contractual right to terminate the Agreement without cause; and (3) that the companies were estopped from terminating the Agreement without cause. The jury found the contracting defendants liable for breach of contract. Defendants then moved for a JNOV, which the trial court granted. The court also ruled that, as a matter of law, plaintiff's theories of modification, waiver and estoppel were not available based on the evidence that had been adduced. On appeal, plaintiff assigns those rulings as error.

There are three clauses in the Agreement that are pertinent to our analysis. The first is the termination clause that provides, in part:

"This Agreement shall terminate upon the death of [plaintiff], and may be cancelled without cause by either [plaintiff] or [defendants] on 30 days written notice."

The Agreement also contained a clause that provides, in part:

"The time to be expended by [plaintiff] is solely within his discretion, and the persons to be solicited and the area within the district involved wherein solicitation shall be conducted is at the election of [plaintiff]. No control is to be exercised by [defendants] over the time when, the place where, or the manner in which [plaintiff] shall operate in carrying out the objectives of this Agreement."

Finally, the Agreement provides that

"this Agreement supersedes and takes the place of any and all prior agreements, written or otherwise, between [plaintiff] and [defendants], or any of them, and no change, alteration or modification hereof may be made, except as is evidenced by an agreement in writing signed by [plaintiff] and an authorized representative of [defendants]."

When the provisions of the Agreement are read together, they require that any modifications to the Agreement must be in writing and signed by the parties. The trial court ruled that there was no evidence of any written modification of the Agreement. The evidence shows that on May 24, 1985, David Winter, defendants' regional sales manager, sent plaintiff a letter that established certain goals that defendants expected plaintiff to attain to avoid termination of the Agreement. Defendants told plaintiff that they would terminate the Agreement if he did not reach the specified goals. The letter also explained that defendants would be exercising more control over plaintiff's business. The letter was signed by Winter and requested that plaintiff also sign the letter and return it to defendants. Plaintiff signed the letter and returned it to defendants.

In particular, the letter provided:

"[Plaintiff has] agreed that all of the goals that we discussed and established were attainable goals. * * *

"* * * * *

"* * * If any of the above goals are not attained by the end of August, we will be asking you for your resignation. All of these goals must be attained. You did indicate that these were reasonable goals and goals which could be attained.

"* * * * *

"* * * *Failure to attain any one of these goals will again result in us requesting your resignation or terminating your appointment agreement.*

"* * * * *

"In addition, we ask that you supply a weekly recruiting report to both Bill Meals and Ed Colvard every Monday. This report should include the number of first time interviews, second interviews and subsequent interviews which you have with prospective agents. Also include the names of the people you were talking with. In addition, indicate the number of first time contacts, from whatever source that you have. Also indicate the source from which the contact came. This will allow us to evaluate your progress on a weekly basis and recommend changes to your plans or to provide you assistance should problem areas pop up. We want to help you in any way we can.

"* * * * *

"* * * *At this point, you will either make the goals that we established together and develop the habits necessary to be a successful district manager over the long haul, or we will have to replace you as a district manager.*

"If you approach this in a positive manner and take advantage of the assistance that we can and will provide, you can attain the established goals. If you are unwilling or unable to put forth the effort necessary to attain these goals, you probably should not be a district manager. *Your future is in your hands. We can help, but can't do the job for you. Your own abilities and efforts will be the determinant factor as to whether you remain as a district manager for the Farmers Insurance Group of Companies.*" (Emphasis supplied.)

Plaintiff argues that the letter constitutes a written modification of the provision in the Agreement that allowed defendants to terminate the Agreement without cause. If plaintiff reached the prescribed goals, then according to the letter, defendants promised to retain him as a district manager. Defendants contend that they did not intend to modify the Agreement by requiring plaintiff to sign the letter but that the letter clarified plaintiff's obligations and gave plaintiff a final opportunity to demonstrate that he could perform his obligations under the Agreement.

Whether the Agreement was modified by the 1985 letter depends on the intent of the parties. Before the alleged modification, the Agreement said that plaintiff could be terminated without cause. The letter does not expressly reserve that right, and it could be reasonably inferred from the letter that defendants promised not to terminate the agreement as long as plaintiff reached the required goals. There is also evidence that defendants orally represented to plaintiff after the 1985 letter that they would terminate the Agreement only for good cause. Because the law of contracts is not concerned with the parties' undisclosed intents and ideas and it gives heed only to their communications and overt acts, a jury could infer from the letter and defendants' conduct that, in exchange for the attainment of the prescribed goals, defendants had committed to terminating their relationship with plaintiff only when good cause existed. *See Kabil Developments Corp. v. Mignot,* 279 Or 151, 157, 566 P2d 505 (1977);

*see also Adair Homes, Inc. v. Jarrell*, 59 Or App 80, 85, 650 P2d 180 (1982) (conduct after the agreement can manifest an acquiescence in a modification of the agreement).

■ Defendants also argue that there was no evidence of consideration for the modification. However, the letter contained mutual promises that could be construed as the consideration for the modification. Under the original agreement, defendants had agreed to take a hands-off approach regarding the operation of plaintiff's business. The execution of the letter permitted defendants to have increased involvement in the business of recruiting and training agents to the detriment of plaintiff. It required plaintiff to supply weekly recruiting reports to defendants and to indicate the number of first-time contacts and the source from which the contacts came. The jury could have believed from the evidence that the *"quid pro quo"* for plaintiff's relinquishment of control over his investment was that defendants could only terminate the Agreement for cause or in the event that plaintiff failed to reach the goals established by the letter. The trial court granted the JNOV on the contract claim on the mistaken premise that there was no evidence that the parties had entered into a written modification of their original agreement. As a result, it erred.

## CONTRACT CLAIM—NEW TRIAL

■ In addition to the grant of a JNOV on the contract claim, the trial court alternatively granted defendants a new trial in the event that the JNOVs were reversed on appeal. The trial court ruled that it had given an erroneous jury instruction and had refused to give an instruction that would have cured the error.

Defendants requested the following jury instruction, which the trial court refused to give:

"Plaintiff contends that the provisions of the Appointment Agreement concerning the parties' rights to terminate without cause was modified by the parties, both orally and in writing, during the term of the agreement. In order to be valid, a modification of a contract must meet all of the requirements for formation of a contract. To find that there was a modification, you must find that there was an offer

and acceptance, that the parties mutually assented to the modification and the terms of the modification, and that there was an exchange of consideration for the modification."

Before the trial court instructed the jury, the parties and the trial court discussed proposed instructions. Plaintiff objected to all but the first sentence of the above instruction. Defendants argued that "it is of course well established that the minds of the parties must have met upon the asserted modification" and contended that "our [instruction] is a correct statement of the law." Ultimately, the trial court instructed the jury on the breach of contract claim as follows:

"Plaintiff contends that the provisions of the appointment agreement concerning the parties' rights to terminate without cause was [*sic*] modified by the parties orally or in writing or by conduct of the parties during the term of the agreement. Plaintiff must prove any modification by clear and convincing evidence.

"Clear and convincing evidence is that which enables you to find the truth of the facts asserted is highly probable.

"Consideration is a necessary element for a valid modification. To form a valid modification, both parties must give consideration for the performance by the other party."

Defendants took a general exception on the ground that their requested instruction was not given in its entirety.

In support of its ruling granting a new trial, the trial court explained:

"The jury instruction on modification contained no language on the core requirement of mutual assent. Oregon cases dealing with the issue of modification emphasize the importance of mutual assent over all other required elements. Further, there is no specific instruction directing the jury to determine that once they found mutual assent to a standard different then 'at-will' they needed also [to] determine if the parties also mutually assented to waiving the requirement that this modification be in writing."

Plaintiff first argues that defendants are not entitled to a new trial based on the erroneous jury instruction because they did not preserve the error. ORCP 64 B(6).[2] He argues

---

[2] ORCP 64 B(6) requires:

that defendants made only a general exception and that in order to preserve an error about the failure to give a requested jury instruction, the instruction must be clear and correct in form and substance and free from all error. *Beglau v. Albertus*, 272 Or 170, 179, 536 P2d 1251 (1975). Also, according to plaintiff, defendants' requested instruction was erroneous because it required the jury to find "an offer and acceptance," in addition to mutual assent to establish a modification of the Agreement, suggesting that offer and acceptance and mutual assent are discrete elements.

We disagree with plaintiff's argument. Although the requested instruction is not a model of clarity, we are not persuaded that the jury would have been misled by it. An offer and acceptance is one manner in which mutual assent is manifested. In the context of the facts of this case, the requested instruction would have told the jury that a necessary predicate to finding that the Agreement had been modified was an offer and acceptance. Inasmuch as plaintiff's theory was that the modification occurred as a result of the 1985 letter sent by defendants and signed by plaintiff, we do not believe that the instruction would have created an erroneous impression on the jury about the legal requirements for a modification. Finally, it is clear from the combination of defendants' response to plaintiff's objection to the instruction before it was given and defendants' exception after it was not given that the trial court was put on notice as to defendants' position and was given the opportunity to correct its mistake. *Menke v. Bruce*, 88 Or App 107, 113 n 6, 744 P2d 291 (1987).

◼    Next, plaintiff argues that the instruction that the trial court gave was adequate and that no prejudicial error occurred. In *Waterway Terminals v. P.S. Lord*, 256 Or 361, 369-70, 474 P2d 309 (1970), the court said:

> "A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:
>
> "* * * * *
>
> "B(6)   Error in law occurring at the trial and objected to or excepted to by the party making the application."

"The exact wording of instructions is something which judges and lawyers, despite their technical training, often disagree upon and discuss in minute detail at great lengths. It is absurd to expect a layman to listen once to an oral rendition of a highly technical instruction and to appreciate immediately all of the fine legal distinctions. As a result, cases should not be reversed upon instructions, despite technical imperfections, unless the appellate court can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jurymen which affected the outcome of the case."

Thus, in deciding whether a new trial is warranted, the issue is whether the instruction given by the trial court probably created an erroneous impression of law in the minds of the jurors.

■　　The trial court's instruction omitted an essential element of a modification of a contract, and defendants' requested instruction would have supplied that element. The missing element was not just a technical imperfection; it was central to the issue of the parties' intent in determining whether the contract had been modified. We conclude that the instruction given by the trial court probably created an erroneous impression of the law in the minds of the jurors that affected the outcome of the case. In essence, it permitted the jury to find a modification of the agreement without determining whether both parties intended to modify the original agreement. Thus, defendants are entitled to a new trial on the contract claim.

## WAIVER AND ESTOPPEL

Because the contract claim must be remanded to the trial court for a new trial, we must address two other issues that will arise on retrial. The trial court also ruled as a matter of law that there was no evidence in the record that defendants had waived their right under the Agreement to terminate without cause or that the basis for an estoppel existed. The trial court explained:

"On the evidence submitted by plaintiff on this issue there was no waiver as a matter of law. This is not a case where defendants had engaged in a course of conduct with this plaintiff where a right they had was not enforced such

as a landlord repeatedly allowing rent to be paid several days after the due date in a written lease. Defendants had a right to terminate plaintiff on 30 days written notice exercisable at any time. Simply because defendants attempted repeatedly to get plaintiff to comply with defendants standards of operation and told plaintiff he would be terminated for poor performance is not a circumstance that would require defendants to immediately fire plaintiff on a 30 day notice or forever lose that right."

■ In order for a provision of a contract to be waived, there must be an intentional relinquishment of a known right and the waiver must be manifested by clear and unequivocal action by the party. *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or 235, 240-41, 855 P2d 626 (1993). By relinquishing a known right, a party must dispense with something of value or forego some advantage on which the party might have demanded or insisted. In this case, the Agreement gave defendants the right to terminate plaintiff without cause at any time on 30 days' written notice. The jury could have found from the evidence that defendants manifested that they were not going to enforce that provision of the Agreement when they told him subsequently that they would terminate the agreement only for good cause.

■■ Defendants also argue that any waiver had to be in writing under the Agreement. Oregon law is to the contrary. Waiver may be proved "by parol and by circumstantial evidence, as well as by direct testimony." *Bank of Eastern Oregon v. Griffith*, 101 Or App 528, 534, 792 P2d 1210 (1990). Moreover, "a party to a written contract can waive a provision of that contract by conduct or by oral representation, despite the existence of a nonwaiver clause." *Moore*, 317 Or at 241. Accordingly, plaintiff is entitled to present his waiver theory to the jury on retrial.

■■ Plaintiff also claims that defendants breached the contract because they are "estopped" from terminating the Agreement without cause as a result of their representations to plaintiff. In essence, plaintiff seeks to rewrite the Agreement on the basis of an equitable estoppel. The doctrine of equitable estoppel does not provide a cause of action under the circumstances relied on by plaintiff. In other words, an

equitable estoppel, when properly understood, is a defensive doctrine that prevents an inequitable result.

In *Bramwell v. Rowland,* 123 Or 33, 36, 261 P 57 (1927), the plaintiff superintendent of banks brought an action on a promissory note payable to an insolvent bank. The defendant-maker of the note contended that the insolvent bank had represented that the note would be paid as the result of a collateral transaction. The jury found for the plaintiff. On appeal, the defendant argued that the trial court had erroneously instructed the jury that it had to find that the insolvent bank had intended to defraud the defendant at the time that the promise had been made. *Id.* at 43. The Supreme Court affirmed, finding no fault with the trial court's instructions, and it distinguished between the concepts of fraud and estoppel. It said:

> "Fraud and estoppel *in pais* are alike in respect that each is dependent upon a representation. In fraud, the representation is the foundation of the cause of action or of the defense; reliance upon it has inflicted an injury for which the party seeks redress or rescission. In estoppel, the representation * * * has made known the party's position in regard to a material fact; from this position, he would like to retreat, but the representee desires to hold him to that position. The injury has not yet been inflicted but the party invoking the estoppel says that, unless the representator is prevented from shifting his attitude, an injury will occur to the representee. When all of the elements of fraud are present, a cause of action exists; all the elements of estoppel may be present and yet no cause of action exists because estoppel is not a cause of action. The function of estoppel is to preserve facts in favor of the representee. Thus, one writer has said:
>
> > " 'To use the language of naval warfare, estoppel must always be either a mine-layer or a mine-sweeper; it can never be a capital unit.' Spencer, *Bower on Estoppel by Representation*, p. 12." *Id.* at 44.

We followed the *Bramwell* court's holding in *Howell v. Oregonian Publishing Co.,* 82 Or App 241, 247, 728 P2d 106 (1986), *on recons* 85 Or App 84, 735 P2d 659, *rev den* 303 Or 699 (1987). In that case, the plaintiff brought an equitable action for reformation, claiming that the parties were

estopped from relying on the written provisions of the contract. We rejected that argument and held that equitable estoppel could not be used to change a term that had not been the subject of mutual assent in an express contract. In other words, the plaintiff in *Howell* was not seeking by his claim in reformation to prevent an uninflicted injury. Rather, he sought affirmative relief through the use of an estoppel. Because estoppel is a defensive measure designed to prevent or "stop" a claim, we held that it was not available as an offensive doctrine to change a term in contract upon which to base a breach of contract action.

The dissent views the doctrine of equitable estoppel more expansively. It says:

> "[Plaintiff] is not attempting to use estoppel as the basis for an independent claim but rather to prevent defendants from denying that an *existing* contract contains the terms that they represented to him that it contained." 150 Or App at 83-84 (emphasis in original).

It concludes that plaintiff is seeking to use the doctrine in the same way that we held that the plaintiff in *Gillman v. Emel*, 89 Or App 153, 747 P2d 390 (1987), could use it. Arguably, there is *dictum* in our case law that supports the dissent's view.[3] However, a correct understanding of the doctrine refutes the dissent's argument.

In *DeJonge v. Mutual of Enumclaw*, 315 Or 237, 843 P2d 914 (1992), the issue in a declaratory judgment action was whether the defendant insurer was estopped to deny liability coverage to the plaintiffs based on a policy exclusion. The plaintiffs argued that an estoppel occurred when the defendant orally represented that plaintiffs would be fully covered. The court held that the plaintiffs were using the doctrine of equitable estoppel improperly. *Id.* at 241. The court

---

[3] In *Mittleman Properties v. Bank of California*, 131 Or App 666, 673, 886 P2d 1061 (1994), we said in *dictum* that "[a]rguably, an estoppel could give rise to an implied agreement modifying the terms of the lease between plaintiff and defendant." We then found that there was no evidence that the plaintiff relied on the defendants' representations. We are now faced directly with the issue of whether estoppel may be used to modify the terms of an express agreement. To the extent that our opinion in *Mittleman* suggests the availability of such a theory on these facts, we disavow that interpretation.

relied on its holding in *ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 307, 744 P2d 998 (1987). It said:

> "The *ABCD...Vision* court distinguished between using estoppel affirmatively, to *create* a right to coverage not contained in the insuring clauses of the policy, and using it defensively, to *preserve* a right to coverage already acquired by preventing its forfeiture. The court held that estoppel is not available in the former situation to negate an express exclusion in the written contract but is available in the latter situation to avoid a condition of forfeiture of coverage." *DeJonge*, 315 Or at 241 (emphasis in original).[4]

The underlying rationale for the court's holding in *DeJonge* is that where there is an express contract, courts cannot create a new contract for the parties by estoppel. *Id.* at n 3.

In *Gillman*, we acknowledged that "[e]stoppel is not in itself the basis for a claim, but that it may be a method of proving the facts necessary to establish the claim that the plaintiff does make." 89 Or at 156-57. That statement is a correct statement of law when an estoppel is viewed as a defensive doctrine. For example, the plaintiff in *Gillman* brought an action to recover unpaid sales commissions that she allegedly had earned while working for the defendants. The defendants counterclaimed against the plaintiff, contending that they had actually overpaid her and that she was entitled only to a lower commission. There was no express agreement between the parties. Through the use of the doctrine of estoppel, the plaintiff sought to require the defendants to adhere to the representations that they had made about the amount of the commission and that were contrary to the position being taken by them at trial. Thus, when we said in *Gillman* that it was "appropriate" for the plaintiff to use estoppel to

---

[4] The dissent points out that we have previously allowed a plaintiff to use equitable estoppel offensively in *Collver v. Salem Insurance Agency, Inc.*, 132 Or App 52, 61, 887 P2d 836 (1994), *rev den* 320 Or 598 (1995). However, in that case, we distinguished the *DeJonge* holding and held that, because there was no written policy, plaintiffs could use equitable estoppel to establish the terms of an *implied* agreement. In *Collver*, plaintiff was not using estoppel to change the terms of an *express* agreement. Implied contracts are based on equitable principles. "The implied in law contract is indeed no contract at all, it is simply a rule of law that requires restitution to the plaintiff of something that came into [the] defendant's hands but belongs to the plaintiff in some sense." *Derenco v. Benj. Franklin Fed. Sav. and Loan*, 281 Or 533, 557, 577 P2d 477 (quoting Dobbs, *Remedies* § 4.2 at 235 (1973)), *cert den* 439 US 1051 (1978).

establish the terms of a *quantum meruit* claim as well as part of an affirmative defense to the defendants' counterclaim, that should not be understood to mean that the doctrine is available as an offensive doctrine to change the terms of an express contract. *Gillman*, 89 Or App at 156.

In this case, plaintiff seeks to change the terms of the written employment contract between the parties by relying on the doctrine of equitable estoppel. In other words, he is asking us to create a new contract for the parties through the use of the doctrine by modifying their previous agreement. In *Bramwell* and in *DeJonge*, the Supreme Court has expressly rejected in concept the offensive use of the doctrine for that purpose. The dissent's assertion that plaintiff is attempting to use the doctrine "to prevent defendants from denying that an *existing* contract contains the terms that they represented to him that it contained" ignores the uncontroverted fact that the written agreement permits termination without cause and plaintiff acknowledges the existence of the original agreement. To prevail on his claim for damages based on contract, plaintiff must first prove a mutual modification of that provision of the agreement to allow termination only for cause. Otherwise, the use of the equitable estoppel doctrine would have the effect of changing the terms of the parties' express agreement without mutual assent in an action at law. That would be contrary to the principle that express contracts can only be modified by mutual assent. The trial court was correct for the wrong reason. As a matter of law, equitable estoppel is not available to plaintiff under these circumstances as a legal theory.

## TORT CLAIMS

■ Plaintiff also claims that the trial court erred when it granted JNOVs on two claims that he has labeled as a "tortious" breach of duty of good faith and fair dealing and breach of a fiduciary duty. The trial court ruled:

"Both parties and the court are well aware that the tort claims are virtually identical. In fact the plaintiff realleged all of his allegations from the good faith claim in his fiduciary duty claim. The only addition was the claim that defendants breached fiduciary or fiduciary like obligations to plaintiff. The most recent law in Oregon has virtually

erased any possible distinction between the two claims. The duties that are owed in each are loyalty, fairness and full disclosure. Because the court does not believe there is any distinction between the two claims, the analysis below applies equally to each tort claim."

Defendants also group the two tort claims together on appeal and argue that "where one party to a contract seeks to sue the other in tort, '[t]he dispositive issue is whether [the defendant] was subject to a standard of care independent of the contract.' " (Brackets in original.) We agree and will also address the two tort claims together. Under either theory of breach of fiduciary duty or the tortious breach of duty of good faith and fair dealing, plaintiff was required to present evidence that a special relationship or a fiduciary-type relationship existed between the parties that was independent of the duties under the Agreement. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 648, 891 P2d 639 (1995); *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 617, 892 P2d 683 (1995).

The trial court granted the JNOVs on the two tort claims because it believed that "plaintiff's employment relationship remained at-will." The court reasoned that, because there was no evidence that the Agreement had been modified to allow for termination only for cause, there was no duty as a matter of law that existed independent of the duties under the Agreement. The court explained:

"Since the contract clearly and fully covered all the rights and duties of the parties and all monies sought by plaintiff were as a result of the termination and not the on going performance of the contract there is no separate tort."

However, as we have already decided, a jury could infer that the Agreement had been modified so that it could only be terminated for good cause. Accordingly, the trial court's reasoning was erroneous.

Nonetheless, the question remains whether there was evidence of breaches of duty that were independent of the terms of the contract that would preclude JNOVs on the tort claims, assuming that the Agreement was modified by the 1985 letter and defendants' conduct. The Supreme Court has explained that determining whether there is a standard

of care independent of a contractual relationship depends on the nature of the relationship between the contracting parties:

> "The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitations. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both." *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992).

The first inquiry is whether a jury could infer that the parties entered into a fiduciary relationship. In *Starkweather v. Shaffer*, 262 Or 198, 205, 497 P2d 358 (1972), the court held:

> "A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

In *Conway v. Pacific University*, 324 Or 231, 241, 924 P2d 818 (1996), the court explained:

> "In all those relationships, one party has authorized the other *to exercise independent judgment in his or her behalf* and, consequently, the party who owes the duty has a special responsibility to administer, oversee, or otherwise take care of certain affairs belonging to the other party." (Emphasis supplied.)

In this case, the evidence presented by plaintiff does not demonstrate that FGI and FICO acted or exercised their independent judgment on behalf of plaintiff's interest.

Rather, the tenor of the letter is that plaintiff would have to perform in accordance with defendants' increased expectations and exercise of control to keep his business. FGI and FICO employees met with plaintiff every month to review, criticize and approve every aspect of his business. They often insisted that plaintiff operate his business in accordance with their instructions. They provided extensive advertising programs and reimbursements, participated in audits of his agents, monitored his daily appointment calendar, exercised control over the location of his office and even the types of signs he used for his office. These facts demonstrate that FGI and FICO instructed and exercised control on how *plaintiff* should perform his duties. However, there is an additional component to a fiduciary relationship that is missing.

In *Conway*, the court said, "Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party." 324 Or at 240 (emphasis in the original). In this case, there is no evidence that defendants undertook a special responsibility regarding plaintiff's interests. Plaintiff argues that FGI and FICO had a special responsibility toward plaintiff because they promised to assist him in any way they could. However, promising to assist and actually acting for a person are not the same for purposes of establishing a fiduciary relationship. In order for FGI and FICO to have a fiduciary duty towards plaintiff, they actually would have had to have acted for plaintiff. The evidence does not show that defendants undertook to carry out plaintiff's obligations under their agreement or to act on his behalf to further his economic interest.

Plaintiff relies on our decision in *Eulrich v. Snap-On Tools Corp.*, 121 Or App 25, 853 P2d 1350, *rev den* 317 Or 583, *vacated on other grounds sub nom Snap-On Tools v. Eulrich*, 512 US 1231, 114 S Ct 2731 (1994), and argues that when there is evidence of dependency and control in a relationship, a special relationship can exist. We disagree. *Conway* requires that in order for a special relationship to exist, "one party has authorized the other *to exercise independent judgment in his or her behalf.*" 324 Or at 241. *Eulrich* illustrates the point. In that case, there was evidence that

"the field manager rode along with plaintiff and actually conducted sales on behalf of plaintiff. Plaintiff's supervisor did all of his paperwork for the first month, and continued to do some of that paperwork throughout plaintiff's tenure as a dealer. * * * There was also evidence that defendants promised to 'take care of' their dealers and exercised complete control over how the business was run and over the size and location of the dealer's territory." *Eulrich*, 121 Or App at 37.

The components of the relationship in *Eulrich* included not only control and dependency but also an undertaking by the defendant to act on behalf of the plaintiff's interest. Those facts do not exist in this case and, thus, the relationship between plaintiff and defendants does not give rise to a fiduciary relationship. The trial court properly granted the JNOVs on the tort claims.

Because of our prior ruling, we do not address plaintiff's other arguments or defendants' cross-assignments of error.

Judgment notwithstanding the verdict on contract claim reversed; order granting new trial on contract claim affirmed and remanded for new trial; otherwise affirmed.

**ARMSTRONG, J.,** concurring in part and dissenting in part.

I concur in the majority's opinion on all issues except estoppel. I dissent from its holding that plaintiff may not assert that defendants are estopped from enforcing their contractual right to terminate the contract with plaintiff without cause. That holding both misunderstands and unnecessarily rejects our previous cases on estoppel.

The essential point that the majority ignores is that plaintiff is not attempting to create a new cause of action for estoppel but simply to hold defendants to those representations about the terms of the existing contract that they made and on which he relied. That is an appropriate use of estoppel and is consistent with our earlier cases and with the general ways for forming and modifying contracts. In this context, estoppel is merely one way to establish the enforceable requirements of a contract without meeting all of the requirements

for the modification of a bilateral contract. The majority expressly recognizes one of the other methods of establishing those requirements and does not question the others.

Immediately before rejecting plaintiff's estoppel claims, the majority holds that a party may waive a contractual right simply by manifesting an intention to relinquish it. Under the facts of this case, the waiver has the effect of modifying the contract to include a requirement that defendants can terminate it only for cause.[1] 150 Or App at 73-75. Other methods of creating or modifying contractual rights without the traditional trappings of a bilateral contract include notifying the other party of the new terms, which the other party implicitly accepts by continuing to perform as before, *see Yartzoff v. Democrat-Herald Publishing Co.*, 281 Or 651, 657, 576 P2d 356 (1978), promissory estoppel, *see Schafer et al v. Fraser et ux*, 206 Or 446, 468-72, 290 P2d 190, 294 P2d 609 (1956), *Neiss v. Ehlers*, 135 Or App 218, 899 P2d 700 (1995), and unilateral contracts, *see Oregon State Police Officers' Assn. v. State of Oregon*, 323 Or 356, 368-71, 918 P2d 765 (1996).

The majority's rejection of estoppel as a way to modify a contract is thus inconsistent with the recognition of these other similar ways to achieve that result. In reaching its conclusion it relies on (and misunderstands) *Bramwell v. Rowland*, 123 Or 33, 261 P 57 (1927), and *Howell v. Oregonian Publishing Co.*, 82 Or App 241, 728 P2d 106 (1986), *on recons* 85 Or App 84, 735 P2d 659, *rev den* 303 Or 699 (1987). *Bramwell* simply stands for the point that, in contrast to fraud, "all of the elements of estoppel may be present and yet no cause of action exists because *estoppel is not a cause of action*." 123 Or at 44. (Emphasis supplied.) Plaintiff does not dispute that point. He is not attempting to use estoppel as the basis for an independent claim but rather to prevent defendants from denying that an *existing* contract contains the terms that they represented to him that it contained.

---

[1] The majority correctly holds that the jury could find that defendants *waived* the right to terminate plaintiff's contract without cause on 30 days' notice, thereby essentially making the contract terminable only for cause. 150 Or App at 74. It does not explain why defendants can create that new requirement by waiver but not by estoppel.

We defined "estoppel" in *Daly v. Fitch*, 70 Or App 18, 21 n 2, 687 P2d 1124 (1984), as

> "an equitable principle that precludes someone from exercising a right to another's detriment if the right holder, through words or conduct, has led the other to believe that the right would not be exercised."

We pointed out that a court's refusal to enforce a time-of-the-essence clause in a land-sale contract because of the vendor's acceptance of late payments is most appropriately described as based on estoppel rather than on waiver. *Id.* Thus, estoppel changes the parties' rights under the contract. There is no reason to treat the effect of that change in the parties' rights as different depending on who is seeking relief.

The cases that the majority discusses are consistent with my view that plaintiff is entitled to assert that defendants were estopped from terminating the contract without cause and that their attempt to do so was a breach of the contract that entitles plaintiff to damages.[2] In *Howell*, the plaintiffs brought claims for breach of contract, reformation, and fraud, all relating to their contracts with the defendant. The plaintiffs did not assert that their reliance on the defendant's alleged representations had affected the terms of the existing contract or was otherwise relevant to their breach-of-contract claims. After resolving the breach-of-contract and fraud claims, we rejected the plaintiffs' reformation claims as without merit in a one-sentence paragraph, without any reference to estoppel.

By focusing on the reformation claim in its discussion of *Howell*, the majority shows that it misunderstands that case. The plaintiffs in *Howell* attempted to use estoppel as the ground for an independent claim, not as support for

---

[2] The majority points out that equitable estoppel is not a basis for extending coverage under an existing insurance policy. *See DeJonge v. Mutual of Enumclaw*, 315 Or 237, 843 P2d 914 (1992); *ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 744 P2d 998 (1987). That holding is, at least in part, based on considerations unique to insurance law. *See DeJonge*, 315 Or at 241 n 3. In any case, it *is* possible for estoppel to be a ground for avoiding a condition of forfeiture, which is similar to its potential use in this case to prevent the enforcement of the provision of the contract that permits termination without cause. That restriction on the enforcement of a provision of an existing contract is *not* the creation of a new contract for the parties.

their claim for reformation. Nothing in our opinion supports the majority's statement that the plaintiff based its reformation claim on an assertion that "the parties were estopped from relying on the written provisions of the contract," nor that we held that "equitable estoppel could not be used to change a term that had not been the subject of mutual assent in an express contract." 150 Or App at 75-76. Our entire statement on estoppel was:

> "Appellants have also pleaded claims for equitable relief. They contend that defendant is estopped from relying on renewal provisions in the written contracts to terminate dealerships without cause, because of defendant's conduct (the oral promises to renew) on which they have relied. Equitable estoppel, however, is not a cause of action. *Bramwell v. Rowland*, 123 Or 33, 44, 261 P 57 (1927). We therefore affirm the summary judgment against relief based on the estoppel claims."

82 Or App at 247. We rejected estoppel as an independent claim for relief, nothing more.

In contrast to *Howell*, *Gillman v. Emel*, 89 Or App 153, 156-57, 747 P2d 390 (1987), is directly contrary to the majority's holding and applies to this case. In *Gillman*, the plaintiff sued to recover unpaid sales commissions, alleging that she was entitled to a rate greater than the defendants had paid. The defendants counterclaimed to recover commissions that they had already paid her, alleging that she was entitled to a lower rate. In reply, the plaintiff alleged that the defendants had represented that she would receive the higher rate and that they were estopped from denying her any other rate. 89 Or App at 155. That is clearly a use of the doctrine to establish one of the terms of the parties' agreement.

We held that the plaintiff's pleading of estoppel was not a separate equitable claim but was part of the legal claim that the trial court submitted to the jury. As a result, the trial court erred when it purported to decide the issue on its own after the verdict. We explained, citing *Bramwell*, that "[e]stoppel is not in itself the basis for a claim, *but it may be a method of proving the facts necessary to establish the claim that the plaintiff does make*." 89 Or App at 156-57 (emphasis

supplied). Nothing in our opinion suggests that the procedural fact that the plaintiff first raised estoppel in response to the defendants' counterclaim made any difference. The plaintiff used estoppel to establish her rate of pay, which was relevant *both* to her claim *and* to the defendants' counterclaim. As we said, she used estoppel "to establish the claim" that *she* made.[3]

Plaintiff seeks to use estoppel in this case precisely in the way that we held that the plaintiff in *Gillman* could use it. He alleges that he relied on defendants' representations that they would not terminate the Agreement without cause. If he is correct, those representations modified the existing contract by depriving defendants of a right that they otherwise had, and defendants breached the contract as modified. Plaintiff is not seeking to assert estoppel as an independent claim but to use it to show what the parties' actual agreement was at the time that defendants terminated him and thus to support his breach-of-contract claim. He should be able to do that. The majority fails to give an adequate reason for changing the rule in our previous cases that allows him to do so. I therefore dissent from that portion of its opinion.

Deits, C. J., and Riggs and Leeson, JJ., join in this concurrence and dissent.

---

[3] In *Mittleman Properties v. Bank of California*, 131 Or App 666, 673, 886 P2d 1061 (1994), we relied on this statement in explaining that an estoppel could arguably give rise to an implied agreement modifying the terms of the lease at issue. The majority treats that statement as *dictum* and then rejects it. 150 Or App at 76 n 3. Whether or not it is correct on that point, in *Mittleman* we clearly treated *Gillman v. Emel*, 89 Or App 153, 747 P2d 390 (1987), as properly stating the law and considered the plaintiff's estoppel arguments on their merits. We repeated that statement, relying on both *Bramwell* and *Gillman*, a few days later in *Collver v. Salem Insurance Agency, Inc.*, 132 Or App 52, 60, 887 P2d 836 (1994). The repeated statements of this court on an important point of law deserve greater respect than the majority seems willing to give them in this case.